# 12-1680-cv

## United States Court of Appeals

### *for the*

### Second Circuit

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

– v. –

PENTAGON CAPITAL MANAGEMENT PLC, LEWIS CHESTER,

*Defendants-Appellants,*

PENTAGON SPECIAL PURPOSE FUND, LTD.,

*Relief Defendant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR REHEARING AND REHEARING *EN BANC*

FRANK C. RAZZANO
IVAN B. KNAUER
MATTHEW D. FOSTER
JOHN C. SNODGRASS
PEPPER HAMILTON LLP
*Attorneys for Defendants-Appellants*
Hamilton Square
600 14th Street, NW, Suite 500
Washington, DC 20005
(202) 220-1200

# TABLE OF CONTENTS

RULE 35(b) STATEMENT .................................................................... 1

REASONS FOR GRANTING REHEARING ........................................ 3

      A.    In Upholding Liability For an Implied Misrepresentation Without Any Finding That the Misrepresentation Was Attributed To the Appellants, the Decision Conflicts With the Supreme Court's Recent Ruling in *Janus* ................... 3

      B.    In Affirming Imposition Of Joint And Several Liability To Disgorge a Third Party's Gain—In an Amount Vastly Exceeding Any Proven Gain By the Appellants—the Decision Misconstrues And Conflicts With Second Circuit Precedent and Federal Law ........................................... 8

CONCLUSION ................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Gregory O. Trautman*, Exchange Act Rel. No. 61167, 2009 SEC LEXIS
4173 (Dec. 15, 2009) ............................................................8

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___, 131 S.
Ct. 2296 (2011) ..........................................................*passim*

*SEC v. AbsoluteFuture.com*, 393 F.3d 94 (2d Cir. 2004)................................*passim*

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996) ................*passim*

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)..........1, 3, 9, 14

*VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011)..........................................8

STATUTES

15 U.S.C. § 77t(d) and 78u(d)(3) ...........................................................14

Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ...............12

Section 10(b) of the Securities Exchange Act of 1934.....................................1, 2, 4

OTHER AUTHORITIES

SEC Rule 10b-5(a) and (c).......................................................................6

SEC Rule 10b-5(b)..............................................................................2, 4, 5

SEC Rule 22c-1.................................................................................7, 8

## RULE 35(B) STATEMENT

Defendants-Appellants Pentagon Capital Management PLC ("PCM") and Lewis Chester petition for panel rehearing and rehearing *en banc* of the panel's August 8, 2013 decision (the "Decision" or "Dec."). The Decision affirmed the district court's determination that the Appellants are liable under Section 10(b) of the Securities Exchange Act of 1934 as "makers" of an implied misrepresentation, and it affirmed the district court's imposition of joint and several liability to disgorge $38 million in gain earned not by the Appellants, but by the fund they advised.

This petition presents questions of exceptional importance, because the Decision ignores an essential element of the test for primary liability established by the Supreme Court's recent holding in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___, 131 S. Ct. 2296 (2011). Moreover, in affirming the district court's disgorgement award, the Decision misconstrues Second Circuit precedent regarding joint and several liability for disgorgement, in *SEC v. AbsoluteFuture.com*, 393 F.3d 94 (2d Cir. 2004), and *SEC v. First Jersey Securities*, 101 F.3d 1450 (2d Cir. 1996) (both cited by the panel). The Decision also conflicts with long-standing Second Circuit precedent regarding the purpose, measure, and equitable boundaries of disgorgement, such as *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972).

1

*First*, the panel erred when it found that the Appellants were "as much" the "makers" of an implied misrepresentation under Section 10(b) and SEC Rule 10b-5(b) as were third party brokers at Trautman Wasserman & Co. ("TWC").  In holding the Appellants primarily liable for that misrepresentation without any consideration of *attribution*, the panel ignored a necessary element of the Supreme Court's definition of "maker" in *Janus*, which turns on both ultimate authority and attribution.  Accordingly, the first question presented for panel rehearing and rehearing *en banc* is:

> Under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5(b), can a defendant be liable with a third party as the "maker" of an implied misrepresentation, where there is no determination that such misrepresentation was *attributed* to the defendant by the defrauded parties?

*Second,* the panel erred in affirming the district court's imposition of joint and several liability to disgorge $38 million in gain earned by the relief defendant—not by the Appellants.  The Decision misconstrues recent Second Circuit authority regarding when joint and several liability may be imposed, as well as the proper measure of such liability.  Tellingly, the panel's consideration of these issues is sparse, comprising just two double-spaced pages in the Decision.

By affirming the Appellants' liability to disgorge a third party's gain—where the district court itself found that the SEC had failed to establish the

Appellants' gain with the requisite certainty—the panel disregarded long-standing

Second Circuit authority holding that disgorgement that exceeds a defendant's gain

constitutes an improper penalty. The Decision makes no mention of this Circuit's

ruling in *Manor Nursing*. Moreover, the Decision misconstrues both

*AbsoluteFuture.com* and *SEC v. First Jersey Securities*, *Inc.*, 101 F.3d 1450 (2d

Cir. 1996)—*AbsoluteFuture.com* actually undermines the panel's conclusion and

*First Jersey Securities* does not support joint and several liability here.

Accordingly, the second question presented for panel rehearing and

rehearing *en banc* is:

> May a court impose joint and several liability to disgorge
> the entire amount of a third party's gain, in an amount
> that vastly exceeds any gain earned by the defendant,
> where there is no finding that the defendant controlled
> the third party, combined profits, or transferred funds
> between the defendant and the third party, and where the
> district court expressly found that plaintiff had failed to
> prove defendant's gain with the requisite certainty?

## REASONS FOR GRANTING REHEARING

### A. In Upholding Liability For an Implied Misrepresentation Without Any Finding That the Misrepresentation Was Attributed To the Appellants, the Decision Conflicts With the Supreme Court's Recent Ruling in *Janus*

The Decision erroneously affirms the district court's imposition of

primary liability for an implied misrepresentation without any consideration of

whether such misrepresentation was attributed to the Appellants. The Decision is

3

thus in conflict with the Supreme Court's holding in *Janus* that "attribution" is a

necessary element of the test for misrepresentation liability under Section 10(b)

and Rule 10b-5(b) of the Exchange Act.  Further, the panel's finding that the

Appellants were "as much 'makers' of those statements as were the brokers at

[TWC]" disregards the "clean line" drawn in *Janus* between "makers" of

misrepresentations, who can be held primarily liable, and others, who can only be

held secondarily liable.

      In *Janus*, the Supreme Court held that "attribution" is a key element

of the test of who is a "maker" of a misrepresentation under Section 10(b) and Rule

10b-5(b).  The Court defined "maker" thus:

> For purposes of Rule 10b-5, the maker of a statement is
> the person or entity with ultimate authority over the
> statement, including its content and whether and how to
> communicate it. Without control, a person or entity can
> merely suggest what to say, not "make" a statement in its
> own right.  One who prepares or publishes a statement on
> behalf of another is not its maker.  And in the ordinary
> case, *attribution within a statement or implicit from
> surrounding circumstances is strong evidence that a
> statement was made by—and only by—the party to whom
> it is attributed.*[1]

Later in the *Janus* opinion, the Court emphasized that attribution is a "necessary"

element of the "maker" test for primary liability.  In determining whether a

---

[1]    *Janus*, 131 S. Ct. 2296, 2302 (2011) (emphasis added).  Note that the italicized portion quoted above was wholly omitted from the Decision.

statement was "made" indirectly, the Court wrote, "[m]ore may be required…but *attribution is necessary*."  *Janus*, 131 S. Ct. 2296 at 2305 n. 11.

The district court initially sought to avoid the "maker" question altogether by holding that *Janus* does not apply to SEC enforcement actions.   But even if *Janus* did apply, the district court held, the Appellants were still the "maker" of the misrepresentation.  The district court considered "ultimate authority" but conducted no analysis of the attribution question, which is a necessary element of the test for primary liability.

The panel made similar errors.  Quoting only that portion of the *Janus* "maker" test that relates to "ultimate authority" (and omitting the part that relates to attribution), the panel found that the Appellants were "as much 'makers'" of the misrepresentation implied by late trading "as were the brokers at [TWC]."  Dec. 17.  The panel's finding that the Appellants were "as much 'makers'" cannot be reconciled with *Janus*, because *Janus* draws a "clean line" between the maker of a misrepresentation and those who may have merely used or benefited from it.

In *Janus*, the Supreme Court considered whether an investment advisor (the "Advisor") could be held liable under Rule 10b-5(b) for misrepresentations contained in the prospectus of one of the mutual funds that the Advisor managed (the "Fund").  The Fund's prospectus stated that the Advisor would not engage in market timing, but a subsequent government investigation

5

revealed this statement to be false.  Relying in large part on the definition of the word "make," the Supreme Court held that the Advisor could not be held liable for false statements in the Fund's prospectus because the "maker" of the false statements was the Fund itself.  The Court held:

> We draw a clean line between the two—the maker is the person or entity with ultimate authority over the statement *and others are not*.

*Janus*, 131 S. Ct. 2296, 2302 & n. 6 (emphasis added).

The panel's conclusion conflicts with *Janus* because it disregards the "clean line" drawn by the Supreme Court between "makers," who are primarily liable, and others, who are only secondarily liable.  It is readily apparent that the Appellants were not the "makers":  their broker had ultimate authority over the misrepresentation implied by late trading.   The Appellants could not trade on their own—they managed the trading signal, but they had no contact at all with the mutual funds.   The broker, on the other hand, had contact with the mutual funds and thus had the ultimate authority over the misrepresentation implied by late trading.  Accordingly, the Appellants cannot be held primarily liable.[2]

---

[2]   Although the panel found that Appellants were primarily liable on a "scheme" theory under Rule 10b-5(a) and (c), the "fraudulent activities" identified by the panel (Dec. 17) are not inherently deceptive acts that would support an independent finding of "scheme" liability.  At worst, the acts cited might give rise to aiding and abetting liability, but the district court declined to consider this issue, so the case should be remanded for further consideration of this question.

6

Further, like the district court, the panel made no findings or conclusions regarding the attribution element of the "maker" test. There is no discussion of attribution in either the district court's or the panel's opinion. Yet it is plainly stated in *Janus* that attribution is now a central element of the test.

All of the evidence in this case shows that the misrepresentation implied by late trading was attributed to the broker and not the Appellants. Uncontradicted trial testimony established that the Appellants had no contact with the mutual funds, so there is no likelihood that the funds would have attributed any representation implied by the late trading to the Appellants. Appellants' Br. 41-42. Moreover, all of the Appellants' late trades were placed by their brokers at TWC using Bank of America's clearing system, and unchallenged testimony at trial established that the mutual funds viewed the Appellants' broker—and not the Appellants—as their customer. *Id.* Finally, SEC Rule 22c-1 places the gatekeeping duty squarely on the broker—and not the Appellants—to ensure that trades are priced correctly. For these reasons, the mutual funds attributed the representation implied by the late trading to the Appellants' brokers: the only entities with whom the funds had contact, the only entities that the funds considered to be their customers, and the only entities with any legal duty under Rule 22c-1's "forward pricing rule." Thus, under both *VanCook v. SEC*, 653 F.3d 130 (2d Cir. 2011), and *Janus*, the "makers" of the implied misrepresentation were

7

the Appellants' brokers, which have already been held primarily liable by the SEC for the very same misrepresentations at issue here. *See, e.g., Gregory O. Trautman*, Exchange Act Rel. No. 61167, 2009 SEC LEXIS 4173 (Dec. 15, 2009).

**B.    In Affirming Imposition Of Joint And Several Liability To Disgorge a Third Party's Gain—In an Amount Vastly Exceeding Any Proven Gain By the Appellants—the Decision Misconstrues And Conflicts With Second Circuit Precedent and Federal Law**

The Decision erroneously affirms the district court's $38 million disgorgement award, which held the Appellants jointly and severally liable for the entire amount of gain earned by the relief defendant Pentagon Special Purpose Fund, Ltd. ("PSPF") and *not* by the Appellants.  The panel's brief analysis of disgorgement, which comprises merely two double-spaced pages, ignores long-standing Second Circuit law regarding the purpose and scope of disgorgement, misconstrues recent Second Circuit law regarding joint and several liability, and conflicts with federal law regarding penalties for securities law violations.

Lacking any mention of the district court's finding that the SEC had failed to prove the Appellants' gain with the requisite certainty (SPA-214-15), the Decision nevertheless finds no abuse of discretion in the district court's imposition of $38 million in disgorgement, on a joint and several basis.  The panel's conclusion is contrary to established Second Circuit precedent and inconsistent with federal law, for at least four reasons.

8

*First*, it is an abuse of discretion to require the Appellants to "disgorge" funds that they never received.  The Decision is thus at odds with Second Circuit precedent regarding the "primary purpose of disgorgement," which is to "correct unjust enrichment" by depriving a violator of ill-gotten gains.  *SEC v. AbsoluteFuture.com*, 393 F.3d 94, 96 (2d Cir. 2004).  Requiring the Appellants to "return" money they never obtained is not disgorgement, it is punishment.  That was this Circuit's ruling in *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972), where this Circuit found abuse of discretion in a district court's award of disgorgement that exceeded the defendant's ill-gotten gain.  In *Manor Nursing*, this Circuit held that a disgorgement award constituted an inappropriate penalty assessment to the extent that it exceeded the defendant's gain, and required that the award be reduced to the amount received by the defendant in connection with the unlawful conduct.  The Decision makes no mention of *Manor Nursing* or of any other of a surfeit of decisions from this Circuit and others holding that the fundamental purpose of the disgorgement remedy is to prevent unjust enrichment.  Here, the SEC not only failed to establish the Appellants' gain but also conceded that the $38 million was earned by the relief defendant PSPF, not the Appellants, so there is every indication that the district court's disgorgement award is entirely punitive.

9

*Second*, the panel's reliance on *AbsoluteFuture.com* is misplaced. The Decision cites *AbsoluteFuture.com* to support the panel's finding that the district court did not abuse its discretion in holding the Appellants jointly and severally liable to disgorge the *total* gain. But *AbsoluteFuture.com* in fact seriously undermines the panel's conclusion: there, this Circuit *did* find abuse of discretion where the district court had held individual defendants jointly and severally liable for the total gain. And in that case, this Circuit actually *reduced* the disgorgement awarded against individual defendants so that it would not exceed that portion of the illegal gain that had been combined and transferred between defendants. 393 F.3d at 95-96.

In this case, there was not even an allegation that the Appellants controlled and transferred the proceeds of the illegal gain among themselves. So there is no basis under *AbsoluteFuture.com*—or *any* of this Circuit's precedent— for holding the Appellants jointly and severally liable to disgorge the total gain. If anything, *AbsoluteFuture.com* stands for the proposition that joint and several liability for disgorgement is appropriate only to the extent that defendants combined and transferred profits among themselves. Seen this way, *AbsoluteFuture.com* is consistent with the purpose of disgorgement—which is not to punish but to prevent unjust enrichment—because defendants who had the ability to transfer funds would presumably be able to get them back to pay the

10

disgorgement.  But in this case, where there was not even an allegation of any such transfer, and where the Appellants lacked any ability to combine and transfer funds, the disgorgement award is in direct conflict with the equitable principles underlying the disgorgement remedy.

        *Third*, the Decision misapplies this Circuit's ruling in *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996), in affirming the Appellants' joint and several liability for the total $38 million gain.  Relying on *First Jersey Securities*, the Decision concludes that joint and several liability is appropriate based merely on the Appellants' collaboration in late trading, without any showing that the Appellants controlled PSPF or transferred any gain between themselves and third parties.  In this regard, the Decision is without precedent in this Circuit: there is no decision in this Circuit where mere "closeness and collaboration" sufficed to support joint and several liability as to the total gain.  *First Jersey Securities* is no exception.  In that case, the defendant was held jointly and severally liable with the broker because he completely controlled the broker—as its 100% owner, president, and CEO—and accordingly had unfettered ability to transfer and withdraw ill-gotten gains to and from the broker.  *Id.* at 1461, 1476. The defendant in *First Jersey Securities* had such complete control over the broker that he was held liable as a "controlling person" of the firm, under Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).  Indeed, this Circuit held that he "possessed

11

control over every aspect of" the broker's operations.  The defendant's control over

the broker was so complete that this Circuit rejected the defendant's contention

that he should be required to disgorge only amounts that he withdrew from the

broker.  The Circuit expressly noted that the defendant's argument:

> might be more persuasive *if he had owned less than all of
> First Jersey's stock*.  But he was the Firm's *sole owner*;
> not surprisingly, he testified at trial that he *could request
> a check in any amount at any time and the Firm would
> issue one to him*.  As he *owned 100% of the Firm*, to the
> extent that the Firm's net worth was increased by its
> unlawful activities, so was [the defendant's] personal
> wealth.

*Id.* at 1476 (emphasis added).

*First Jersey Securities* cannot support holding the Appellants jointly

and severally liable here for the total gain earned by PSPF, because the Appellants

have nothing in common with the defendant in *First Jersey Securities* other than

their management of PSPF's trading activity.  Apart from advising PSPF with

regard to trading, the Appellants had no ownership, direction, or control of PSPF.

The SEC never alleged in this case that the Appellants were "controlling persons"

of PSPF under Section 20 of the Exchange Act, as they did in *First Jersey

Securities*, and there is no evidence that would support such an allegation.  To the

contrary, as explained in the Appellants' brief (at 51, 56-57), the Appellants merely

advised PSPF regarding the trading.  The Appellants neither owned nor controlled

PSPF.  PSPF had a board of directors wholly independent of the Appellants.

Moreover, the Appellants owned none of PSPF's stock, and neither of the

Appellants was a director or owner of PSPF.

Not only is there no finding that the Appellants ever received gains

and transferred them to PSPF (as in *AbsoluteFuture.com*), there is no finding that

the Appellants even could have done such a thing (like the defendant in *First

Jersey Securities*).  As explained in the Appellants' reply brief (at 19-20), even if

there had been a suggestion that the Appellants had the ability to control and

transfer the PSPF funds (there was not), such allegation would have been

contradicted by a wealth of evidence in the case, including the very document on

which the district court relied for its erroneous finding that the Appellants had the

requisite control, which plainly stated that "PCM or its principals [i.e., Chester] do

not act in the capacity of directors of  PSPF, nor of signatories of the Master Fund

or its bank accounts."  Reply Br. 20.  Under the law of this Circuit, lacking

ownership, control, and the ability to transfer ill-gotten gains to PSPF, the

Appellants cannot be held jointly and severally liable to disgorge PSPF's gains.

*Finally,* just as the Decision cannot be squared with Second Circuit

precedent regarding the equitable boundaries of the disgorgement remedy, it

cannot be reconciled with the statutory provision already established by Congress

(at 15 U.S.C. § 77t(d) and 78u(d)(3)) for monetary penalties in enforcement

13

actions. Under *Manor Nursing*, and in view of the equitable principles on which the disgorgement remedy is based, the district court's disgorgement award constitutes an improper penalty to the extent it exceeds the Appellants' gain. The district court expressly found that the SEC failed to establish such gain with the requisite certainty (SPA-214-15), and the SEC has conceded that the gain was earned by PSPF and not by the Appellants. The Appellants have already been found liable for a civil penalty, and the Decision remands the case to the district court for determination of the correct penalty amount. A de facto enhancement of that penalty in the guise of a disgorgement award that bears no relationship to any proven gain by the Appellants is not permitted by federal law or by the law of this Circuit. The district court's disgorgement award should be reversed and remanded for reconsideration of the appropriate disgorgement amount.

## CONCLUSION

The Court should grant the Appellants' petition.

Respectfully submitted,

  /s/ Frank C. Razzano  
Frank C. Razzano
Ivan B. Knauer
Matthew D. Foster
John C. Snodgrass
PEPPER HAMILTON LLP
Hamilton Square
600 14th Street N.W., Suite 500

14

Washington, DC 20005-2004
(202) 220-1200

*Attorneys for Defendants-Appellants*
*Pentagon Capital Management PLC*
*and Lewis Chester*

1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

3    August Term 2012

4    (Argued: April 9, 2013    Decided: August 8, 2013)

5    Docket No. 12-1680-cv

6    ------------------------------------------------x

7    SECURITIES AND EXCHANGE COMMISSION,

8
9    Plaintiff-Appellee,

10
11    -- v. --

12
13    PENTAGON CAPITAL MANAGEMENT PLC, LEWIS CHESTER,

14
15    Defendants-Appellants,

16
17    PENTAGON SPECIAL PURPOSE FUND, LTD.,

18
19    Relief Defendant.

20
21    ------------------------------------------------x

22    B e f o r e : WALKER and CHIN, Circuit Judges, and RESTANI, Judge.*

23    Defendants-Appellants Pentagon Capital Management and Lewis

24    Chester appeal from the 2012 judgment of liability of the United

25    States District Court for the Southern District of New York (Sweet,

26    Judge).  After a bench trial, Defendants-Appellants were found

27    liable for securities fraud under Section 17(a) of the Securities

28    Act of 1933, Section 10(b) of the Securities Exchange Act of 1934,

29    and Rule 10b-5.  The district court ordered disgorgement and

30    imposed a civil penalty.  Both monetary awards were imposed jointly

31    and severally in the amount of $38,416,500.  We find no error in

32    the district court's determination of liability, its disgorgement

* The Honorable Jane A. Restani, of the United States Court of
International Trade, sitting by designation.

1  award, or its decision to impose joint and several liability for

2  the disgorgement amount, but we reverse the district court's

3  imposition of joint and several liability for the civil penalty,

4  vacate that penalty, and remand for reconsideration of the amount

5  of the civil penalty in light of the Supreme Court's decision in

6  Gabelli v. SEC, 133 S. Ct. 1216 (2013).  AFFIRMED in part, VACATED

7  in part, and REMANDED in part.

8                                 BENJAMIN L. SCHIFFRIN (Michael A.
9                                 Conley, John W. Avery, Susan S.
10                                McDonald, David Lisitza, on the
11                                brief), Securities and Exchange
12                                Commission, Washington, DC, for
13                                Appellee.
14
15                                FRANK C. RAZZANO (Ivan B. Knauer,
16                                Matthew D. Foster, John C.
17                                Snodgrass, on the brief), Pepper
18                                Hamilton LLP, Washington, DC, for
19                                Defendants-Appellants.
20
21 JOHN M. WALKER, JR., Circuit Judge:

22      Defendants-Appellants Pentagon Capital Management and Lewis

23 Chester appeal from a judgment of the United States District Court

24 for the Southern District of New York (Sweet, Judge).  After a

25 bench trial, the district court found the defendants liable for

26 securities fraud under Section 17(a) of the Securities Act of 1933

27 (the "Securities Act"), Section 10(b) of the Securities Exchange

28 Act of 1934 (the "Exchange Act"), and Rule 10b-5; ordered

29 disgorgement; and imposed a civil penalty.  Each monetary award was

30 imposed jointly and severally in the amount of $38,416,500.  We

2

1  find no error in the district court's determination of liability,

2  the amount of its disgorgement award, and its decision to impose

3  that award jointly and severally.  But we reverse the district

4  court's imposition of joint and several liability for the civil

5  penalty, vacate that penalty, and remand for reconsideration of its

6  amount in light of the Supreme Court's decision in Gabelli v. SEC,

7  133 S. Ct. 1216 (2013).

8                          **BACKGROUND**

9      We assume the parties' familiarity with the background of this

10  case and recite only those facts relevant on appeal.  For

11  additional detail, we refer the parties to the district court's

12  thorough opinion.  See SEC v. Pentagon Capital Mgmt. PLC, 844 F.

13  Supp. 2d 377 (S.D.N.Y. 2012).  The basis for the district court's

14  imposition of fraud liability was the defendant's practice of late

15  trading in the mutual fund market.  Late trading occurs when, after

16  the price of a mutual fund becomes fixed each day, an order is

17  placed and executed as though it occurred at or before the time the

18  price was determined, thereby allowing the purchaser to take

19  advantage of information released after the price becomes fixed but

20  before it can be adjusted the following day.

21  **I.    Mutual Funds and Late Trading**

22      Mutual fund shares are priced according to the fund's "net

23  asset value," or NAV.  SEC Rule 22c-1, promulgated under the

3

1    Investment Company Act of 1940, requires that a mutual fund

2    calculate its NAV at least once per day, Monday through Friday.  17

3    C.F.R. § 270.22c-1(b)(1) (2013).  A mutual fund's NAV is generally

4    calculated "by using the closing prices of portfolio securities on

5    the exchange or market on which the securities principally trade."

6    Disclosure Regarding Market Timing and Selective Disclosure of

7    Portfolio Holdings, 68 Fed. Reg. 70,402-01, 70,403 (proposed Dec.

8    17, 2003) (to be codified at 17 C.F.R. pts. 239, 274) (final rule

9    adopted in 69 Fed. Reg. 22,300).  However, if the closing price of

10   a security held in a mutual fund's portfolio does not reflect its

11   current market value at the time of the fund's NAV calculation, a

12   mutual fund must calculate its NAV "by using the fair value of that

13   security, as determined in good faith by the fund's board."  Id.

14   This could occur, for example, when some price-affecting event

15   occurs after the closing price is established but before the fund's

16   NAV calculation.  If a mutual fund's shares are mispriced, "an

17   investor may take advantage of the disparity between the portfolio

18   securities' last quoted prices and their fair value."  Id.

19       Rule 22c-1 also requires that mutual funds "sell and redeem

20   their shares at a price based on the NAV next computed after

21   receipt of an order," a practice called "forward pricing."  Id.

22   (emphasis added); see also 17 C.F.R. § 270.22c-1(a).  Forward

23   pricing prevents dilution of mutual fund shares by keeping traders

4

1    from profiting off of a stale share price.  Some mutual fund

2    investors, however, engage in late trading, "the practice of

3    placing orders to buy or redeem mutual fund shares after 4 p.m.,

4    Eastern time, as of which most funds calculate their [NAV], but

5    receiving the price based on the 4 p.m. NAV," instead of the next

6    day's NAV, as required by Rule 22c-1.  Disclosure, 68 Fed. Reg. at

7    *70,402.  In VanCook v. SEC, 653 F.3d 130 (2d Cir. 2011), we held

8    that such late trading violated Rule 22c-1.

9    **II.  Pentagon Capital Management**

10       Chester formed Pentagon Capital Management ("Pentagon") in

11   1998 to facilitate mutual fund trading in the European markets with

12   a market timing strategy.[1]  In 1999, Chester and Pentagon explored

13   the possibility of market timing and late trading in the United

14   States mutual fund market.[2]  To facilitate its trading in the United

---

[1] If a mutual fund misprices its shares, such as by failing to
appropriately use fair value pricing, "short-term traders have an
arbitrage opportunity that they can use to exploit the fund and
disadvantage the fund's long-term investors by extracting value
from the fund without assuming any significant investment risk."
This practice is known as "market timing."  Disclosure, 68 Fed.
Reg. at 70,403.  Because market timing can dilute the value of
long-term shareholders' interests in a mutual fund, many funds have
imposed trading restrictions to minimize the practice, including
"identifying market timers and restricting their trading privileges
or expelling them from the fund."  Id. at 70,404.

[2] International market timers can have an additional advantage
because they

        profit from purchasing or redeeming fund
        shares based on events occurring after foreign
        market closing prices are established, but
        before the events have been reflected in the

1  States, Pentagon formed Pentagon Special Purpose Fund ("PSPF"), the

2  relief defendant in this case.  PSPF was the sole member and

3  manager of three Delaware limited liability companies that were

4  established solely for Pentagon's use in trading mutual funds in

5  the United States.  At all times relevant to this case, Pentagon

6  was PSPF's investment advisor and made all of its trading

7  decisions.

8        In the United States, unlike in Europe, Pentagon was required

9  to trade through a broker.  As relevant here, Pentagon primarily

10  used two individual brokers, James Wilson and Scott Christian,

11  first at other brokerage firms, and finally at Trautman, Wasserman

12  & Company ("Trautman").  Pentagon began trading through Trautman on

13  February 15, 2001.

14        Based on Pentagon's instructions, Wilson and Christian

15  executed Pentagon's trades through Bank of America, Trautman's

16  clearing broker.  Notwithstanding that the NAV was normally fixed

17  at 4:00 p.m., Bank of America used a processing system for mutual

18  fund orders that allowed brokers to change an order until 5:15 p.m.

19  or 5:30 p.m. and later, until 6:30 p.m.

---

            fund's NAV.  In order to turn a quick profit,
            market timers then reverse their positions by
            either redeeming or purchasing the fund's
            shares the next day when the events are
            reflected in the NAV.

SEC v. Gabelli, 653 F.3d 49, 53 (2d Cir. 2011), rev'd on other
grounds, 133 S. Ct. 1216 (2013).

1        The parties do not dispute that Pentagon utilized Bank of

2   America's permissive clearing system to engage in late trading with

3   the assistance of Trautman's brokers.  Pentagon opened 67 different

4   accounts with Trautman, each of which could trade separately

5   without a mutual fund knowing they were related.  Wilson and

6   Christian registered the accounts with different broker numbers

7   with the effect that if a mutual fund detected late trading or

8   market timing and blocked one account from trading, other accounts

9   could remain active.  Pentagon knew that various of its accounts

10  had been expelled from at least thirteen funds, but it continued to

11  trade in those funds using different accounts.

12       In April 2001, Chester sent an email to Wilson and Christian

13  detailing Pentagon's "After Hours Trading Instructions."  Chester

14  instructed that Wilson and Christian would receive a target figure

15  on the Standard & Poors ("S&P") future[3] near the close of the

16  markets from a Pentagon employee; then, if the future exceeded or

17  fell below the target, the brokers were to contact Pentagon to ask

18  them what to do.  Chester then emailed other executives at Pentagon

19  about the potential for late trading through Trautman:

---

[3] Black's Law Dictionary defines futures as "standardized assets
(such as commodities, stocks, or foreign currencies) bought or sold
for future acceptance or delivery."  Black's Law Dictionary 746
(9th ed. 2009).  Whether an index future (like the S&P future)
rises or falls depends on whether other investors believe the
stocks comprising that index will rise or fall on a specified date
in the future.

7

```
 1                    For this week only, [Trautman] can place or
 2                    cancel any trades up to 5:00pm (10pm UK time).
 3                    From next week – [Trautman] to confirm – the
 4                    time will be 6:30pm (11:30 pm UK time).
 5
 6                    The significance of this is great.
 7
 8                    For instance, last night, the S & P future
 9                    shot up at around 9:45pm [UK time].  Even
10                    though we hadn't placed any trades before 9pm
11                    [UK time], we STILL COULD HAVE PLACED THE
12                    TRADE after the bell, which we should have
13                    done given the marked rise in the future.
14
15                    I have been in Jimmy [Wilson's] office.  Every
16                    day, whether we do a trade or not, they time-
17                    stamp our trade sheets before 4pm, and then
18                    sit on them until they leave the office, at
19                    which point they will process them or not.
20                    Hence, the ability to place a buy order after
21                    the bell, even if we haven't done so before
22                    the bell.
23
24                    . . .
25
26                    This facility is VERY VALUABLE and we should
27                    utilize it accordingly.
28
29                    . . .
30
31                    It doesn't matter whether we place trades or
32                    not before the bell, we can do so afterwards,
33                    up to Trautman's time limits.
34
35  Pentagon, 844 F. Supp. 2d at 400-01 (alterations omitted).
```

36      Thereafter, Christian would create potential trade sheets for

37  Pentagon each day and time-stamp them before 4:00 p.m.,

38  notwithstanding that the actual decision to place the order or not

39  would be made after 4:00 p.m.  Then, sometime after 4:00 p.m., a

40  Pentagon employee would email Christian the instructions for

1  Pentagon's late trades for that day.  The district court found that
2  Pentagon realized profits of "approximately $38,416,500 from the
3  U.S. mutual fund [late] trades they executed through [Trautman]"
4  between February 15, 2001 and September 3, 2003.  Id. at 427.

5      Pentagon tried to conceal its late trading activities.  For
6  example, on July 30, 2002, Chester sent an email to a broker that
7  instructed him not to use the words "market timing" (which, viewed
8  broadly, includes late trading) on any correspondence, telling him
9  "'to label what we do . . . "dynamic asset allocation," but never
10  market timing!'"  Id. at 396.  In August 2002, Chester instructed
11  another Pentagon employee to "phone around First Union" to see if
12  late trading was available because "late trading is key," adding
13  "[I] don't know how you find out about this [late trading] without
14  actually saying it.  No doubt you'll work it out!"  Id. at 408.

15      In September 2003, the New York Attorney General announced
16  that it had settled an enforcement action with Canary Capital
17  Partners for violations of the New York State securities laws,
18  including late trading.  Shortly thereafter, Chester received a
19  request from an investor for a letter stating that Pentagon had not
20  engaged in late trading or any other illegal activity.  Chester
21  provided the letter, stating that Pentagon had "'never entered into
22  arrangements with any U.S. onshore Mutual Fund in order to trade
23  post-4:00pm EST for same-day NAV,'" and that all of Pentagon's

9

1  trading arrangements were "'in accordance with the relevant rules,

2  regulations, investment prospectus, and/or any other such relevant

3  documentation relating to the investment(s) concerned.'"  <u>Id.</u> at

4  410.

5      On April 3, 2008, the SEC brought this enforcement action

6  against Pentagon.  The complaint alleged that Pentagon's market

7  timing and late trading activities violated Section 17(a) of the

8  Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

9  After a seventeen-day bench trial, the district court found Chester

10 and Pentagon primarily liable for late trading.[4]  The district court

11 found that appellants "did not act merely in reliance on their

12 broker-dealers . . . [but] directed, indeed micromanaged, the late

13 trading that [Trautman] performed on their behalf."[5]  <u>Id.</u> at 421.

14 The district court entered an injunction prohibiting Pentagon from

15 late trading in the future.  It also held Pentagon, Chester, and

16 PSPF jointly and severally liable for a $38,416,500 disgorgement

---

[4] The district court found that because market timing is not illegal
<u>per se</u> and because the SEC "did not establish the funds' particular
market timing rules . . . or that Defendants in fact took actions
that would have operated a fraud with respect to those rules," that
the defendants were not liable under the securities laws for their
market timing activities not involving late trading.  <u>SEC v.
Pentagon Capital Mgmt. PLC</u>, 844 F. Supp. 2d 377, 416 (S.D.N.Y.
2012).

[5] With respect to late trading, because the district court made a
finding of primary liability, it did not reach the question of
whether defendants had aided and abetted Trautman in the late
trading scheme.  <u>See id.</u> at 423.  Hence, the question of aider-and-
abettor liability is not presented on this appeal.

1   award and $38,416,500 in civil penalties.  The amount of

2   $38,416,500 was based on the district court's valuation of the

3   profit Pentagon, Chester, and PSPF realized in late trading through

4   Trautman between February 15, 2001 and September 3, 2003.  This

5   appeal followed.

6                              **DISCUSSION**

7       On appeal, Pentagon and Chester argue that they cannot be held

8   liable because their actions involved no fraud or deceit and that

9   as investment advisors (as opposed to brokers), they cannot be held

10  primarily liable for securities fraud.  They further argue that the

11  district court made various errors related to the monetary awards.

12  Following a bench trial, we review the district court's findings of

13  fact for clear error and its legal conclusions <u>de novo</u>.  <u>SEC v.</u>

14  <u>Mayhew</u>, 121 F.3d 44, 50 (2d Cir. 1997).

15  **I.   Primary Liability for Securities Fraud**

16      Section 17(a) of the Securities Act makes it

17              unlawful for any person in the offer or sale
18              of any securities . . .
19
20      (1)   to employ any device, scheme, or artifice
21            to defraud, or
22      (2)   to obtain money or property by means of
23            any untrue statement of a material fact
24            or any omission to state a material fact
25            necessary in order to make the statements
26            made, in light of the circumstances under
27            which they were made, not misleading; or
28      (3)   to engage in any transaction, practice,
29            or course of business which operates or

                                11

1                    would operate as a fraud or deceit upon
2                    the purchaser.
3
4   15 U.S.C. § 77q(a) (2012). Section 10(b) of the Exchange Act, in

5   relevant part, makes it unlawful for any person to "use or employ,

6   in connection with the purchase or sale of any security registered

7   on a national securities exchange . . . any manipulative or

8   deceptive device or contrivance in contravention of such rules and

9   regulations as the Commission may prescribe." 15 U.S.C. § 78j(b)

10  (2012). Finally, Rule 10b-5, implementing Section 10(b), includes

11  three subsections:

12                    It shall be unlawful for any person, directly
13                    or indirectly, by the use of any means or
14                    instrumentality of interstate commerce, or of
15                    the mails or of any facility of any national
16                    securities exchange,
17
18              (a)  To employ any device, scheme, or artifice
19                    to defraud,
20              (b)  To make any untrue statement of a
21                    material fact or to omit to state a
22                    material fact necessary in order to make
23                    the statements made, in light of the
24                    circumstances under which they were made,
25                    not misleading, or
26              (c)  To engage in any act, practice, or course
27                    of business which operates or would
28                    operate as a fraud or deceit upon any
29                    person,
30
31                    in connection with the purchase or sale of any
32                    security.
33
34  17 C.F.R. § 240.10b-5 (2013).

35       We have held that to violate Section 10(b) and Rule 10b-5, a

36  party must have "(1) made a material misrepresentation or a

                                    12

1   material omission as to which he had a duty to speak, or used a

2   fraudulent device; (2) with scienter; (3) in connection with the

3   purchase or sale of securities." SEC v. Monarch Funding Corp., 192

4   F.3d 295, 308 (2d Cir. 1999). The requirements for a violation of

5   Section 17(a) apply only to a sale of securities but in other

6   respects are the same as Section 10(b) and Rule 10b-5, except that

7   "no showing of scienter is required for the SEC to obtain an

8   injunction under [Section 17] (a)(2) or (a)(3)." Id.

9       Pentagon and Chester do not deny that they engaged in late

10  trading. The defendants argue, however, that there was no fraud or

11  deceit in their actions. The defendants also argue that an

12  investment advisor—as opposed to a broker—may not be held liable

13  for securities fraud because the advisor is not responsible for

14  communicating the direction to late trade to the clearing broker.

15  We reject both arguments.

16      First, the defendants' argument that their lack of fraudulent

17  or deceitful intent bars a finding of liability fails because

18  deceitful intent is inherent in the act of late trading. The late

19  trader places an order after the daily mutual fund price is set,

20  but receives the benefit of additional information that the earlier

21  price does not reflect. For this reason, we have held that late

22  trading violates all three subsections of Rule 10b-5 because, as

23  discussed above, it violates Rule 22c-1, the forward-pricing rule.

13

1    See VanCook, 653 F.3d at 138.  In VanCook, an individual broker

2    sought out a clearing broker that would allow him to clear late

3    trades, used time-stamped trade sheets as evidence that orders were

4    placed before 4 p.m. when they were not, and assured his employer

5    that he had not facilitated late trading.  In short, "he was [the

6    scheme's] architect."  Id. at 139.  We found that VanCook went

7    beyond making misrepresentations, taking "a series of actions over

8    several years to implement a scheme that he devised."  Id.  On

9    these grounds, we held that VanCook's late trading violated all

10   three subsections of Rule 10b-5.  Although Section 17(a) was not at

11   issue in VanCook, the requirements for a violation of Section

12   17(a), as relevant here, are identical to the requirements for a

13   violation of Section 10(b).  Thus, we have no trouble concluding

14   that Section 17(a) is also implicated by late trading activity (so

15   long as some of the late trading involves the sale of securities).

16       Pentagon and Chester engaged in similarly deceitful behavior.

17   They sought out brokers who would engage in late trading.  As

18   evidenced by Chester's email, they knew that the trade sheets were

19   time-stamped before 4 p.m., even though they had no intention of

20   trading before that time.  Finally, they issued a false and

21   deceitful letter of assurance that they were not engaging in late

22   trading, similar to VanCook's false assurances to his employer.

14

1    The defendants are not identically situated to VanCook,

2  however.  VanCook was a broker, directly bound by the language of

3  Rule 22c-1, which applies to issuers of securities, persons

4  "authorized to consummate transactions in any such securit[ies],"

5  principal underwriters, and dealers in securities.  17 C.F.R.

6  § 270.22c-1(a).  Investment advisors are not explicitly mentioned

7  in Rule 22c-1, but that is of no moment when the claims are brought

8  under Sections 17 and 10 and Rule 10b-5.  Pentagon and Chester were

9  as much the "architects" of this scheme as VanCook was, and they

10  orchestrated the late trading program carried out by their brokers.

11  They are liable under Section 17(a), Section 10(b), and Rule 10b-5

12  because their actions caused the misrepresentations as to the time

13  of the trades and led to their concomitant deception.[6]  Pentagon's

14  role as an investment advisor therefore does not shield it from

15  liability under the securities laws.

---

[6] We endorse the reasoning of the district court in SEC v. Simpson
Capital Management, Inc., 586 F. Supp. 2d 196 (S.D.N.Y. 2008),
which dealt with the late trading activities of an investment
advisor and the relevance of Rule 22c-1 in the context of a motion
to dismiss.  In Simpson, the SEC alleged that the investment
advisor "was responsible for all investment decisions[,] . . .
carefully identified individuals . . . who agreed to participate in
the late trading scheme[, and] . . . orchestrated late-trading
schemes."  Id. at 208.  We endorse the district court's finding in
Simpson that these allegations were sufficient to state a claim for
primary 10b-5 liability against an investment advisor.
Specifically, the district court reasoned that "the existence of
[Rule 22c-1] . . . provides the background for why the defendants
. . . engaged in a scheme where they could obtain the prices that
were set as of 4:00 p.m. ET, even though their transactions
actually occurred at a later time."  Id. at 203.

15

1    We also reject the defendants' corollary argument that they

2    may not be held liable because they did not communicate directly

3    with the mutual funds.  In Janus Capital Group, Inc. v. First

4    Derivative Traders, 131 S. Ct. 2296 (2011), shareholders of Janus

5    Capital Group sued Janus Capital Group and Janus Capital Management

6    for making false statements in mutual fund prospectuses filed by

7    Janus Investment Fund.  Because Janus Investment Fund retained

8    ultimate control over the content of the prospectuses, the Supreme

9    Court held that Janus Capital Management could not be liable as a

10   "maker" of the statement under Rule 10b-5:

11                  For purposes of Rule 10b-5, the maker of
12                  a statement is the person or entity with
13                  ultimate authority over the statement,
14                  including its content and whether and how
15                  to communicate it.  Without control, a
16                  person or entity can merely suggest what
17                  to say, not "make" a statement in its own
18                  right.  One who prepares or publishes a
19                  statement on behalf of another is not its
20                  maker.
21
22   Id. at 2302.  To illustrate its point, the Supreme Court used the

23   analogy of "the relationship between a speechwriter and a speaker.

24   Even when a speechwriter drafts a speech, the content is entirely

25   within the control of the person who delivers it."  Id.  Pentagon

26   and Chester argue that because they never communicated directly

27   with the mutual funds, they cannot be held liable as "makers" of

28   any false statements.

16

1      To the extent that late trading requires a "statement" in the

2  form of a transmission to a clearing broker, we find that in this

3  case, Pentagon and Chester were as much "makers" of those

4  statements as were the brokers at Trautman.   The brokers may have

5  been responsible for the act of communication, but Pentagon and

6  Chester retained ultimate control over both the content of the

7  communication and the decision to late trade.

8      Moreover, we reaffirm our holding in <u>VanCook</u> and find that the

9  defendants' activities violated all three subsections of Rule 10b-

10  5, not just subsection (b), which was the only subsection at issue

11  in <u>Janus</u>.   Pentagon's late trading activity, beyond the

12  communication of the trades themselves, included finding brokers

13  and a clearing system that would allow late trades, as well as the

14  specific coordination—on a daily basis—of the transmission of

15  instructions to buy or sell or refrain from doing so based on NAVs

16  and after-hours information.   In short, Pentagon's fraudulent

17  activities independently satisfy the requirements of scheme

18  liability under Rule 10b-5(a) and (c) and Section 17(a).

19      We have considered the remainder of Pentagon's arguments and

20  find them to be unpersuasive.   The district court's determination

21  of liability is affirmed.

17

1    **II.   Monetary Awards**

2    The district court imposed joint and several liability for a

3    disgorgement award and a civil penalty, each in the amount of

4    $38,416,500.  The district court first determined that both

5    monetary awards would be imposed jointly and severally because the

6    defendants (including the relief defendant) "collaborated on the

7    mutual fund trading scheme, and [Chester and Pentagon] exercised

8    complete control over PSPF's trading."  844 F. Supp. 2d at 425.

9    The district court then determined that a disgorgement award of

10   $38,416,500 was appropriate because it was a reasonable

11   approximation of the profit made through defendants' late trades

12   with Trautman beginning in February 2001.  Turning to the amount of

13   the civil penalty, the district court applied Section 20(d) of the

14   Securities Act and Section 21(d)(3) of the Exchange Act.  Because

15   the violation involved "'fraud, deceit, manipulation or deliberate

16   or reckless disregard of a regulatory requirement' and 'directly or

17   indirectly resulted in substantial losses or created a significant

18   risk of substantial losses to other persons,'" the district court

19   awarded the maximum penalty, in this case, the gross amount of the

20   pecuniary gain.  Id. at 427 (quoting 15 U.S.C. §§ 77t(d),

21   78u(d)(3)).  On appeal, Pentagon argues that the district court

22   erred in setting the amounts and in imposing joint and several

23   liability.

1       **A. Civil Penalty**

2       We review the district court's imposition of the civil penalty

3    for abuse of discretion.  See SEC v. Kern, 425 F.3d 143, 153 (2d

4    Cir. 2005) ("The tier determines the maximum [civil] penalty, with

5    the actual amount of the penalty left up to the discretion of the

6    district court.").

7       In light of the Supreme Court's recent decision in Gabelli,

8    133 S. Ct. 1216, rendered after the district court's decision, we

9    must vacate the district court's civil penalty award and remand it

10   for reconsideration.  In Gabelli, the Supreme Court held that the

11   so-called "discovery rule," which tolls a statute of limitations

12   for crimes that are difficult to detect, does not apply to toll the

13   five-year statute of limitations for fraud cases in SEC enforcement

14   actions.  See id. at 1221-24.  Thus, any profit earned through late

15   trading earlier than five years before the SEC instituted its suit

16   against the defendants may not be included as part of the civil

17   penalty.  All parties agree that remand on this issue is required.

18      We also must reverse the district court's decision to impose

19   joint and several liability for the amount of the civil penalty as

20   an error of law.  See Johnson v. Univ. of Rochester Med. Ctr., 642

21   F.3d 121, 125 (2d Cir. 2011) ("A court abuses its discretion when .

22   . . its decision rests on an error of law . . . .") (per curiam).

23   The statutory language allowing a court to impose a civil penalty

19

1  plainly requires that such awards be based on the "gross amount of

2  pecuniary gain <u>to such defendant</u>."  15 U.S.C. § 77t(d)(2) (emphasis

3  added).  This language does not provide room for the district

4  court's interpretation that the civil penalty be imposed jointly

5  and severally.[7]

6  **B. Disgorgement Award**

7      The district court's disgorgement award is also reviewed for

8  abuse of discretion.  <u>See</u> <u>SEC v. Warde</u>, 151 F.3d 42, 49 (2d Cir.

9  1998).

10     We find no abuse of discretion in the amount of the

11  disgorgement award, which reflected a "reasonable approximation of

12  profits causally connected to the [late trading] violation."  <u>SEC</u>

13  <u>v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1475 (2d Cir. 1996)

14  (quotation marks omitted).[8]  It was reasonable for the district

15  court to consider the profit to PSPF as well as Chester and

16  Pentagon in light of the fact that PSPF existed only to enable

---

[7] Although we vacate the civil penalty award, we find no error in
the district court's methodology for calculating the maximum
penalty by counting each late trade as a separate violation.  <u>See</u>
15 U.S.C. § 77t(d)(2)(C) ("[T]he amount of penalty for <u>each such</u>
<u>violation</u> shall not exceed the greater of (i) $100,000 for a
natural person or $500,000 for any other person, or (ii) the gross
amount of pecuniary gain to such defendant as a result of the
violation." (emphasis added)).

[8] Aside from appellants' assertion that the disgorgement award
should be considered a penalty because it incorporated profits
earned by PSPF, an argument we reject, we do not understand the
appellants to argue that a disgorgement award would be subject to
the statute of limitations provided by 28 U.S.C. § 2642.

1  Pentagon's trading in the United States.  See SEC v.

2  AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004) ("It is only

3  logical that the total disgorgement of multiple defendants be

4  determined by the total amount of profit realized by those

5  defendants.") (per curiam).

6      We also affirm the district court's decision to impose the

7  disgorgement award jointly and severally on all defendants.  Unlike

8  the civil penalty, there is no statutory requirement that a

9  disgorgement award be measured as to each individual defendant.

10  The district court found that relief defendant PSPF opened accounts

11  at Pentagon's direction and that defendants late-traded on PSPF's

12  behalf.  Hence, the district court found that defendants and PSPF

13  had "collaborated" on the late trading scheme, and concluded that

14  joint and several liability with respect to disgorgement was

15  warranted.  See id. at 97 (in reviewing disgorgement award, holding

16  that "joitn and several liability for combined profits on

17  collaborating . . . parties" is "appropriate").  We agree with the

18  district court that, in light of their collaboration, Pentagon,

19  Chester, and PSPF should be held liable for the disgorgement award

20  on a joint and several basis.  See First Jersey, 101 F.3d at 1475-

21  76 (affirming district court's decision to impose joint and several

22  liability of disgorgement award).

1                            **CONCLUSION**

2          For the foregoing reasons, the district court's rulings are

3    AFFIRMED in part, VACATED in part, and REMANDED in part for further

4    proceedings in accordance with this opinion.

22